NOTICE

Decision filed 02/03/23. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2023 IL App (5th) 210426

NO. 5-21-0426

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| JOSHUA MAHAN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Williamson County. |
| | ) | |
| v. | ) | No. 21-MR-150 |
| | ) | |
| THE MARION POLICE PENSION BOARD, SCOTT | ) | |
| MORSE, RONALD SWAFFORD, JESSIE | ) | |
| THOMPSON, TERANCE HENRY, and TAMMY | ) | |
| BEASLEY, | ) | Honorable |
| | ) | Jeffrey A. Goffinet, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court, with opinion.
Justices Welch and Vaughan concurred in the judgment and opinion.

**OPINION**

¶ 1    Appellant, Joshua Mahan, appeals the findings of the Marion Police Pension Board (Board), which terminated his in-the-line-of-duty disability pension. The Board found that Mahan was no longer disabled from performing the duties of a Marion police officer stemming from an injury to his thoracic spine. The Board terminated Mahan's disability payments. For the following reasons, we reverse the Board's decision.

¶ 2                                 I. BACKGROUND

¶ 3    On October 15, 2007, Mahan began working as a police officer for the Marion Police Department. On May 20, 2011, he suffered an injury to his thoracic spine while on duty as a police

1

officer. It was reported that while in pursuit of a suspect, Mahan stepped into a ditch that was not visible to him; "jarred" his body, neck, and spine; and felt pain in his neck, thoracic spine, and lumbar spine. Mahan reportedly completed the arrest but later went to the emergency room where he was treated and discharged. On March 12, 2012, Mahan filed an application for in-the-line-of-duty pension benefits under the Illinois Pension Code (40 ILCS 5/1-101 *et seq.* (West 2012)).

¶ 4    Pursuant to section 3-115 of the Pension Code (40 ILCS 5/3-115 (West 2012)), the Board held a hearing on July 26, 2012, to determine Mahan's eligibility for a disability pension. Prior to this hearing, Mahan was examined by Dr. Lange and Dr. Bernard Rerri. The record in this case does not contain any reports from Dr. Lange. An Independent Medical Evaluation (IME) report (2012 IME report) was prepared by Dr. Bernard Rerri and submitted to the Board.

¶ 5    Dr. Rerri's 2012 IME report provided as follows. Mahan reported that since the injury, he has had persistent lower neck pain, mid scapular pain, bilateral arm pain, and numbness in his little fingers. He also reported that he experienced episodic spasms of neck pain and upper thoracic pain. He described his pain level as 7 out of 10, with some relief while sitting or lying down. Despite epidural injections, physical therapy, exercise therapy, medications, modified activity, and "other supportive treatments," Mahan remained in significant discomfort and had been unable to return to his job as a police officer. In his report, Dr. Rerri stated that surgery for Mahan's injury carried significant risk, with an unpredictable outcome that is sometimes worse than the presenting problem. Dr. Rerri indicated that he would not advise surgical intervention for Mahan's upper thoracic injury and did not offer surgery as an option.

¶ 6    Dr. Rerri opined that Mahan was disabled as a result of his injury and described his disability as "medium." Dr. Rerri believed that Mahan was capable of light duty and sedentary activities that would not involve lifting more than 20 pounds or repetitive testing and bending of

2

his spine. Dr. Rerri also believed that Mahan could perform activities that avoided violence and sudden, explosive increases in physical activity. Dr. Rerri indicated that because Mahan's symptoms were episodic and unpredictable, it would be unreliable for him to maintain a high level of preparedness or carry out sudden, explosive physical activities required for an active-duty police officer. In Dr. Rerri's opinion, Mahan had a disability that made him unable to perform the duties of an active-duty police officer "at this time or in the foreseeable future." Dr. Rerri considered Mahan's disability to be permanent, with little prospect for improvement. Dr. Rerri concluded that he would not recommend that Mahan return to work as an active-duty police officer.

¶ 7 The Board granted Mahan's application for an in-the-line-of-duty disability pension. Subsequent disability review hearings were held in 2016, 2017, and 2018. In 2016 and 2017, Mahan was examined by two separate doctors. Reports from these doctors are not part of the record in this case; however, Mahan's disability pension was continued following the review hearings in 2016 and 2017. In 2018, Mahan was examined by Dr. Joseph Yazdi at the request of the Board, and Dr. Yazdi prepared a report (2018 IME report). Following a 2018 hearing, the Board, relying on Dr. Yazdi's 2018 IME report, concluded that Mahan was no longer disabled. Mahan appealed the Board's 2018 decision to the circuit court. On April 4, 2019, the circuit court reversed the Board's decision. In reversing the Board's decision, the circuit court was critical of Dr. Yazdi's 2018 IME report and found that the Board erred in assigning the weight it did to Dr. Yazdi's opinion. The circuit court was also critical of the Board's rejection of a Functional Capacity Examination (FCE), which demonstrated an inability to perform the duties of a police officer based upon the information provided by Mahan. The circuit court also criticized the Board's finding that Mahan was not credible.

3

¶ 8    In January 2020, Mahan was notified that the Board would again conduct a hearing to review his continued eligibility for disability pension benefits. The hearing was eventually held on March 10, 2021. At this hearing, the Board's attorney also served as the hearing officer, sat in during the Board's deliberations, and wrote the Board's final order. No objection was made to this procedure.

¶ 9    The Board's evidence consisted of the following exhibits: (1) the hearing minutes from the July 26, 2012, hearing, (2) the Marion Police Department job description, (3) medical records from Southern Illinois Healthcare from January 2019 to October 2019,[1] (4) a letter to Dr. Yazdi from the Board's attorney, (5) an IME report from Dr. Yazdi, with attached appendices, dated August 24, 2020 (2020 IME report), (6) a "Certification of Doctor" form, (7) Dr. Yazdi's curriculum vitae, and (8) a copy of the notice of hearing provided to Mahan in January 2020. The Board offered no testimonial evidence from witnesses.

¶ 10    The job description for the Marion Police Department described the nature of the work, the essential job functions, and typical duties of a police officer. The job description included tasks, such as, but not limited to, responding to calls for emergency help, assisting in criminal apprehension, providing back-up to officers in need of help, initiating the use of non-lethal means of apprehension, being cautious of when and how to operate a vehicle in a high-speed situation, keeping personal safety in mind when pursuing on foot, and being aware of the public and their need to feel safe and secure. The job description indicated that to be qualified to serve as a police officer, one must have the physical abilities to perform the duties of a police officer. The individual must also be in good health and "meet standards set forth by state statutes."

---

[1]These records pertain to an injury to Mahan's lumbar spine that was separate from the injury to his thoracic spine that resulted in his disability.

4

¶ 11 The letter from the Board's attorney to Dr. Yazdi requested that he perform an IME to determine whether Mahan remained disabled or to what extent his condition had improved and to provide a detailed opinion related to Mahan's health status regarding his thoracic spine injury. The letter further requested that Dr. Yazdi include the following information: (1) Mahan's condition when first seen by Dr. Yazdi, (2) Mahan's history as taken by Dr. Yazdi, (3) Dr. Yazdi's diagnosis of Mahan's condition, (4) Dr. Yazdi's interpretation of X-ray films, if taken, (5) Dr. Yazdi's prognosis of Mahan's condition, including Dr. Yazdi's opinion as to whether Mahan suffered from any temporary or permanent injury or disability that prevented him from performing the duties of a police officer, (6) Dr. Yazdi's opinion concerning further treatment and whether physical therapy, surgery, or other treatment would improve Mahan's condition, allowing him to return to work as a police officer, and (7) all materials reviewed by Dr. Yazdi in preparation of the IME. The attorney's letter also included a copy of the job description and a "Certification of Doctor" form. Additionally, Dr. Yazdi received a copy of the circuit court's April 4, 2019, order, although the record is unclear as to who provided him with a copy of the order.

¶ 12 Dr. Yazdi's 2020 IME report provided a brief history of Mahan's 2011 injury as well as Mahan's lumbar spine injury. Dr. Yazdi reviewed the Marion Police Department job description, a 2011 MRI of the thoracic spine, Dr. Rerri's 2012 IME report, medical records related to Mahan's lumbar spine injury, and the circuit court's April 4, 2019, order. Dr. Yazdi also reviewed a cervical spine MRI, dated April 13, 2010, and another MRI of the cervical spine, dated October 16, 2011. Dr. Yazdi found that these two MRIs looked "exactly the same." Dr. Yazdi indicated that, in 2018, he spent 1½ hours reviewing records and films and 1¼ hours with Mahan. Dr. Yazdi further indicated that, in 2020, he spent 4½ hours reviewing records and gathering appendices and saw Mahan for 1 hour in his office.

5

¶ 13    Dr. Yazdi's physical examination of Mahan indicated the following: "Motor examination in [*sic*] intact except for left EHL at 4+/5. Sensory is intact throughout. There is no atrophy. DTR 2+ throughout. Straight leg raising is negative. His posture is normal. His gait is intact." Dr. Yazdi noted tenderness and limited range of motion due to pain in the lower cervical facet area. Dr. Yazdi reported that Mahan suffered a loss of cervical range of motion in the following areas: 33% in left lateral bending, 13% in right rotation, and 25% in left rotation. Dr. Yazdi further noted that there was no lumbar tenderness and that his range of motion was normal except for "flexion at 50 degrees," which represented a 17% loss of function.

¶ 14    In the "Impression" section of his report, Dr. Yazdi stated that, as a result of Mahan's thoracic spine injury, Mahan suffered from "left worse than right lower cervical pain radiating to the upper thoracic area involving the shoulder blades and the area between the shoulder blades." Mahan also experienced "intermittent numbness and tingling in the medial left worse than right arm and hand."

¶ 15    Dr. Yazdi's 2020 IME report went on to respond to the circuit court's April 4, 2019, order that had been critical of Dr. Yazdi's opinions. He provided additional information related to portions of his prior 2018 IME report and attached three excerpts from medical books as appendices in explanation of his conclusions. Dr. Yazdi stated that he disagreed with Dr. Rerri's clinical judgment that Mahan's condition was permanent. Dr. Yazdi indicated that Mahan's condition was a common condition that Dr. Yazdi sees almost daily and went on to explain the treatment he would have provided under the circumstances. In that regard, Dr. Yazdi explained he would have started Mahan with physical therapy or chiropractic treatments. If those were not successful, Dr. Yazdi would have proceeded with facet injection. If the injections worked only temporarily, Dr. Yazdi would have proceeded to radiofrequency ablation (RFA) that should have

6

lasted 6-12 months. If the RFA did not work, Dr. Yazdi would have proceeded with cervical epidural injections, which could be repeated up to two to three times every six months if they worked. If the epidural injections did not work, Dr. Yazdi would have recommended total disc replacement. Dr. Yazdi stated that the only time anyone would have taken off work would be for the 6 to 12 weeks following surgery; otherwise, they would be expected to work with minimal to no restrictions. On the "Certification of Doctor" form, Dr. Yazdi checked the space indicating that in Dr. Yazdi's opinion, Mahan was physically able to perform the duties of a police officer.

¶ 16    Mahan also presented evidence at the hearing. In addition to his own testimony, Mahan provided the following exhibits: (1) a copy of the circuit court's April 4, 2019, order, (2) Dr. Rerri's 2012 IME report, (3) an FCE from Joyner Therapy Services, dated March 16, 2018, and (4) a record of a medical visit to Dr. Rerri, dated January 14, 2021, with a letter from Dr. Rerri dated February 9, 2021. The Board's attorney objected to the admission of the 2018 FCE, and it was not admitted as evidence.

¶ 17    The record of Mahan's January 14, 2021, visit with Dr. Rerri provided as follows. Dr. Rerri indicated that Mahan had persistent neck pain, bilateral arm pain, and numbness, especially in the right hand. Dr. Rerri's care plan noted that Mahan had "cervical radiculopathy" and ordered "diclofenac as nsaid and PT" and "xrays cervical spine ap/lat/obliqs." The care plan indicated that Mahan was to see Dr. Rerri in four weeks for reassessment. This medical record indicated that the "Note has not been signed." The February 9, 2021, letter from Dr. Rerri concluded that there had been no change in Mahan's condition/symptoms and that he remained unable to work as a police officer. Both the medical record and the letter contained similar indiscernible signatures in the signature area of the documents.

¶ 18　Mahan testified that since the last disability hearing in 2018, the symptoms related to his injury had gotten worse. Mahan explained that his right hand was constantly numb, tingling, and felt as if it were asleep. Mahan further explained that he felt the numb sensation on the outside of his arm, down through his entire hand. Mahan also testified he experienced spasms between his shoulder blades if he stretched or reached too far. He stated that the spasms contracted his whole torso to the point that he could not breathe or move. Mahan described the spasms as "like being tased" and "like hot rock lava burning" against his spine, between his shoulder blades. Mahan stated that the spasms occurred weekly and that he tried not to do activities that would cause spasms. Mahan explained that tasks, such as getting a drink from the refrigerator or stepping out of his vehicle, could cause spasms. He testified that if he yawned and stretched, he was guaranteed to have a spasm. Mahan further indicated that he had no other symptoms but did not feel as if he had recovered from his injury.

¶ 19　Mahan testified that he was familiar with the duties of a police officer and that, in his opinion, he would not be able to safely perform those duties. Mahan indicated that he had tried running, but running caused spasms and his pain became worse. Mahan stated that he could not lift or carry 100 pounds. He felt that he could carry 30 pounds and lift 45 pounds if the item was on a table. Mahan indicated that his ability to perform tasks over shoulder level was "very minimal," stating that his right arm would weaken and hurt. Mahan indicated that he was right-handed, and he had issues feeling what he was touching unless he looked at it. Mahan doubted his ability to help someone in an emergency or to fight for his life.

¶ 20　When questioned about shooting a gun, Mahan testified that he last shot a gun at the "qualifications" in August or September of 2020. He indicated that retired and disabled police officers continued to qualify with a firearm every year, but he did not do so in contemplation of

8

returning to work. Since leaving the police department, Mahan also maintained his firearms owner identification card. Mahan indicated that he had not fired a gun since the qualifications in 2020 because his condition had worsened, spreading from his fingers to his whole hand. He testified that he would not be able to draw a gun because he did not think his hand was well enough to operate the holster and safely remove the gun. Mahan indicated that if he did not regain feeling in his hand, he did not intend to further qualify with a firearm each year.

¶ 21    Mahan testified that after his injury, he had physical therapy and injections performed. He stated that these treatments did not heal him and that surgery was not recommended because it could do more damage than good. Mahan indicated that he had taken oxymorphone, a pain medication, for his symptoms. He stopped taking oxymorphone because it was an opiate and interfered with his life. Mahan explained that when he took oxymorphone, he felt "kind of hazy" and did not think clearly. Mahan also felt that he was becoming addicted to the medication. At the time of the March 10, 2021, hearing, Mahan had not taken oxymorphone for approximately two years. He indicated that he took anti-inflammatories, such as ibuprofen. He stated that these medications did not work well.

¶ 22    Regarding Mahan's January 14, 2021, visit with Dr. Rerri, Mahan testified that this was the first time he had seen Dr. Rerri since 2012. Mahan went to see Dr. Rerri in anticipation of the March 10, 2021, hearing because Dr. Rerri was one of the original doctors that had seen him in 2012. Mahan testified that during his visit with Dr. Rerri on January 14, 2021, they discussed Mahan's ability to return to work as a police officer, although Mahan had not provided Dr. Rerri with a copy of the job description. Dr. Rerri allegedly told Mahan that he could not return to work. At the office visit, Dr. Rerri had Mahan walk and turn, pushed against his arms, and checked his strength and grip. Mahan indicated that the visit was similar to his visit with Dr. Rerri in 2012.

Mahan testified that Dr. Rerri wanted Mahan to get a recent MRI and try physical therapy again. Mahan indicated that he had not yet started physical therapy but had appointments scheduled with Joyner Therapy Services. Mahan indicated that he needed to complete physical therapy and obtain an X-ray before his insurance would cover the MRI. Regarding the February 9, 2021, letter from Dr. Rerri, Mahan testified that he spoke to Dr. Rerri on the phone and told Dr. Rerri that Mahan needed to know if he could return to work. Mahan indicated that Dr. Rerri then wrote the letter.

¶ 23    As to his work history since the disabling injury, Mahan testified that he worked as a dispatcher following his injury and before receiving his disability pension. After receiving his pension, Mahan resigned from the police department. Following the denial of his pension at the 2018 hearing, Mahan contacted the police department about returning to work. Mahan was informed that the police department did not have a job for him. At the time of the March 10, 2021, hearing, Mahan had been working as a salesman for Brooks Village Green Homes since October 2020, selling modular manufactured homes. Mahan considered this work to be a "desk job." Prior to that, he worked as an estimator for A-1 Buildings for approximately 1½ years.

¶ 24    Following deliberations, a member of the Board made a motion that, based upon the evidence and testimony, Mahan had recovered from his disability to his thoracic spine. The motion passed by a vote of four to one. In its written order, the Board made the following findings. The Board found that Dr. Yazdi's 2020 IME report was credible, thorough, and established that Mahan was not disabled from performing the duties of a Marion police officer due to his thoracic spine injury. The Board further found that the documents from Dr. Rerri were unsigned and lacked specificity to support a position that Mahan remained disabled from performing his duties as a Marion police officer. Finally, the Board found that Mahan lacked credibility because he had not made any effort to improve his alleged condition at the instruction of his doctor. The Board

10

questioned Mahan's sincerity to follow up on Dr. Rerri's advice to pursue treatment because Mahan made no effort to schedule any follow up treatment between January 14, 2021, and the March 10, 2021, hearing.

¶ 25 Mahan filed a "Complaint for Administrative Review" in the circuit court. Following a hearing, the circuit court affirmed the Board's order. This appeal followed.

¶ 26                                    II. ANALYSIS

¶ 27 On appeal, Mahan contends that the Board's finding that he was no longer disabled was clearly erroneous and that the Board's decision to follow Dr. Yazdi's opinion was against the manifest weight of the evidence. Mahan further contends that the proper standard under section 3-116 of the Pension Code (40 ILCS 5/3-116 (West 2020)) was not considered, that the Board's attorney acting as both attorney for the Board and the hearing officer rendered the proceedings unfair, that the Board's attorney erred in not admitting the 2018 FCE, and that reliance on Dr. Yazdi's report was erroneous because he was not a licensed physician at the time of his 2020 IME report.

¶ 28 In administrative cases, we review the administrative agency's decision as opposed to the decision of the circuit court. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504 (2007). The Pension Code provides that judicial review of the Board's decision is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2020)). 40 ILCS 5/5-228 (West 2020). When reviewing the Board's decision, the applicable standard of review depends upon whether the reviewing court is presented with a question of fact, a question of law, or a mixed question of fact and law. *Howe v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 2015 IL App (1st) 141350, ¶ 43.

11

¶ 29 The findings and conclusions of the Board on questions of fact shall be held to be *prima facie* true and correct. 735 ILCS 5/3-110 (West 2020). Questions of fact will be reversed only if they are against the manifest weight of the evidence. *Wade*, 226 Ill. 2d at 504. A decision is against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Wade*, 226 Ill. 2d at 504. While this is a considerably deferential standard, this court's review "cannot amount to a rubber stamp of the proceedings below merely because the Board heard witnesses, reviewed records, and made the requisite findings." *Bowlin v. Murphysboro Firefighters Pension Board of Trustees*, 368 Ill. App. 3d 205, 211 (2006). Questions of law are reviewed *de novo*. *Wade*, 226 Ill. 2d at 505. Mixed questions of law and fact are reviewed under the clearly erroneous standard. *Wade*, 226 Ill. 2d at 505. A decision is clearly erroneous where the reviewing court is left with the definite and firm conviction that a mistake has been made. *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund of the City of Chicago*, 234 Ill. 2d 446, 464 (2009). A mixed question of law and fact is typically one in which the historical facts are not in dispute and the issue is whether the established facts satisfy the statutory standard. *My Baps Construction Corp. v. City of Chicago*, 2017 IL App (1st) 161020, ¶ 115.

¶ 30 The Pension Code must be construed liberally in favor of the rights of the applicant. *Johnson v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 114 Ill. 2d 518, 521 (1986). The Pension Code defines disability as "[a] condition of physical or mental incapacity to perform any assigned duty or duties in the police service." 40 ILCS 5/5-115 (West 2020). If a police officer becomes disabled as the result of an injury incurred in the performance of an act of duty, the officer is entitled to a duty disability benefit equal to 75% of his or her salary. 40 ILCS 5/5-154(a) (West 2020). A police officer's entitlement to disability benefits is contingent upon his or her continued disability. *Peacock v. Board of Trustees of the Police Pension Fund*, 395 Ill. App.

3d 644, 652 (2009). The Board may revoke a police officer's disability benefits if he or she has recovered from the disability. *Peacock*, 395 Ill. App. 3d at 652. The Pension Code provides as follows:

> "A disabled policeman who receives a duty, occupational disease, or ordinary disability benefit shall be examined at least once a year by one or more physicians appointed by the board. When the disability ceases, the board shall discontinue payment of the benefit, and the policeman shall be returned to active service." 40 ILCS 5/5-156 (West 2020).

¶ 31   Here, we are reviewing whether the record of evidence was sufficient to support the Board's decision to terminate Mahan's disability pension based upon the Board's finding that Mahan was no longer disabled. Accordingly, we will review this case under the manifest weight of the evidence standard. See *Wade*, 226 Ill. 2d at 505 (applying a manifest weight of the evidence standard to the question of whether the evidence of record supported the board's denial of an officer's application for a disability pension).

¶ 32   In concluding that Mahan was no longer disabled from performing the duties of a police officer, the Board relied on Dr. Yazdi's 2020 IME report. The Board found that the report was credible, thorough, and established that Mahan was not disabled from performing the duties of a police officer as set forth in the Marion Police Department job description due to his thoracic spine injury.

¶ 33   Dr. Yazdi's 2020 IME report, however, lacked any specific finding that Mahan was no longer disabled. Instead, the primary focus of Dr. Yazdi's 2020 IME report was to respond to the circuit court's April 4, 2019, order that criticized Dr. Yazdi's 2018 IME report. In his 2020 IME report, Dr. Yazdi spent a good deal of his effort offering further explanation as to portions of his 2018 IME report and expressed a disagreement with Dr. Rerri's 2012 clinical judgment that

13

Mahan's disability was permanent. Notably, the 2018 IME report was not part of the record before this court.

¶ 34 Although Dr. Yazdi conducted a physical examination of Mahan and reviewed the records related to Mahan's injury as part of his 2020 IME report, Dr. Yazdi did not discuss how Mahan had recovered from his disability or how he was not limited from performing the duties of a police officer. The only apparent finding as to Mahan's disability is that Dr. Yazdi disagreed with Dr. Rerri's clinical judgment that Mahan's condition was permanent. Dr. Yazdi also set forth a treatment regimen he would have recommended to someone with Mahan's condition and indicated that the only time anyone would be out of work was 6 to 12 weeks after any recommended surgery. Dr. Yazdi's disagreement with Dr. Rerri's initial judgment and hypothetical treatment regimen does not, however, equate to evidence that Mahan had recovered from his disability. See *Hoffman v. Orland Firefighters' Pension Board*, 2012 IL App (1st) 112120, ¶ 31. Whether Mahan had recovered from his disability turned on whether his condition rendered him unable to perform the duties of a police officer, not on whether his condition was permanent or would improve with certain treatment. We acknowledge that on the "Certification of Doctor" form, Dr. Yazdi checked the space indicating that, in his opinion, Mahan was physically able to perform the duties of a police officer. As discussed above, however, Dr. Yazdi's 2020 IME report provided no insight as to how Dr. Yazdi arrived at this conclusion.

¶ 35 Because the Board relied primarily on Dr. Yazdi's 2020 IME report, the Board's conclusion that Mahan was no longer disabled from performing the duties of a police officer was not supported by sufficient evidence. Thus, the Board's decision was against the manifest weight of the evidence.

14

¶ 36    Although we have found that the Board's decision to terminate Mahan's disability pension was against the manifest weight of the evidence, certain matters raised by Mahan may arise again before the Board in future hearings. Consequently, we would be remiss not to comment on the role of the Board's attorney in the proceedings below. The Board's attorney not only represented the Board at the hearing but also communicated with Dr. Yazdi on behalf of the Board, acted as the hearing officer, was present during the Board's deliberations, and prepared the decision and order of the Board. While this practice may not deny a pensioner due process (see *McKee v. Board of Trustees of the Champaign Police Pension Fund*, 367 Ill. App. 3d 538, 547 (2006)), we believe the better approach here would have been to have one attorney act as the hearing officer and another attorney present evidence and question witnesses. Additionally, should Mahan seek to introduce the 2018 FCE in the future, we find that such information would be relevant to the issue before the Board. Although relevant, we make no determination on the weight to be given such evidence, as the circumstances under which the 2018 FCE is introduced may vary. Finally, the issue as to whether Dr. Yazdi was licensed to practice medicine was not raised at the time of the Board hearing. In light of our ruling and the fact that the Board may have Mahan examined in the future, this issue can be raised in a more timely manner in the event Dr. Yazdi is called upon again to examine Mahan.

¶ 37                                  III. CONCLUSION

¶ 38    For the foregoing reasons, we reverse the Board's decision to terminate Mahan's disability pension.

¶ 39    Reversed.

*Mahan v. Marion Police Pension Board*, 2023 IL App (5th) 210426

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Williamson County, No. 21-MR-150; the Hon. Jeffrey A. Goffinet, Judge, presiding. |
| **Attorneys for Appellant:** | Eric Kirkpatrick, of Kirkpatrick Law Offices, P.C., of Belleville, for appellant. |
| **Attorneys for Appellee:** | Dennis J. Orsey, of Dennis J. Orsey, P.C., of Granite City, for appellees. |