2025 IL App (2d) 230278-U
No. 2-23-0278
Order filed August 5, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| BLACKHAWK BUILDING, LLC, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 18-L-140 |
| | ) | |
| JOSEPH A. STANTON, | ) | Honorable |
| | ) | Mark A. Pheanis, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Kennedy and Justice Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial court's judgment was against the manifest weight of the evidence, where, even deferring to the court's credibility findings, the remaining evidence reasonably reflected that plaintiff proved fraud and breach of contract. Reversed and remanded for a determination of appropriate damages and attorney fees.

¶ 2    Plaintiff, Blackhawk Building, LLC (Blackhawk), sued defendants, Joseph A. Stanton (Stanton), Robert Di Pasquantonio, Jeanette Di Pasquantonio, and EAT Restaurant Group, Inc. (EAT), asserting claims of fraud/fraudulent inducement and breach of contract arising out of

Blackhawk's purchase of a commercial property from Stanton.[1]  On July 24, 2023, after a bench trial, the trial court entered judgment on Stanton's behalf and, on November 27, 2023, awarded him attorney fees and costs.  Blackhawk appeals.[2]

¶ 3                                    I. BACKGROUND

¶ 4        We note that, in the first appeal in this case, *Blackhawk Building, LLC v. Stanton*, 2022 IL App (2d) 210452, we provided a detailed background summarizing the parties' claims through summary judgment.  However, we again deem it necessary to recount much of that background, to provide context for trial court's judgment at trial and the claims before us on appeal.

¶ 5              A. EAT's Lease and the Contract Between Blackhawk and Stanton

¶ 6        Stanton owned the property at 524 West State Street in Geneva and on it built a multiunit commercial building, which he leased to various businesses.  Beginning in December 2006, EAT, which was owned by the Di Pasquantonios, leased from Stanton and operated the Urban Grille restaurant in one of the units.  In January 2011, Stanton and EAT extended the lease, effective December 1, 2011, to November 30, 2018.  In relevant part, the lease required EAT to pay Stanton rent on the first day of each month and contained a variable rent schedule, under which the monthly rent was $17,500 in October and November 2013 and increased to $17,850 per month in December

---

[1]Blackhawk voluntarily dismissed its claims against EAT and the Di Pasquantonios, EAT's sole owners, when the Di Pasquantonios were discharged in bankruptcy.  Neither EAT nor the Di Pasquantonios are involved in the appeal.

[2]On June 16, 2025, this court granted the parties' joint motion for status of the appeal.  We acknowledged that, due to an unfortunate clerical error, submission of the appeal for decision had been delayed.  Accordingly, we elected to dispense with oral argument and accelerated the appeal for decision. We thank the parties for requesting a status update and apologize for the administrative error.

2013. The lease also defined what constituted a default: in pertinent part, a default included "[t]he failure of [EAT] to pay an installment of Rent when due," where "such failure continue[d] for [10] days after written notice thereof by [Stanton] to [EAT]."

¶ 7     At some point before November 2013, Stanton decided to sell the property. He hired Jake Finley to broker the sale. On November 21, 2013, Blackhawk, which was owned by David and Susan Wagenaar, and Stanton agreed to purchase terms. Blackhawk agreed to purchase the property for $4,100,000. (The sale price was later reduced to $3,975,000.) Blackhawk also agreed to purchase (and Stanton agreed to assign to Blackhawk) all leases that were then in effect at the property, including EAT's lease. They signed a "Purchase Sale Agreement" (contract) reflecting their agreed terms. Under paragraph 4 of the contract, Stanton was required to deliver to Blackhawk certain due-diligence materials and allow Blackhawk access to his books and records relating to the property. Blackhawk retained the right to terminate the contract for any reason for 45 days after the materials were delivered.

¶ 8     Paragraph 5 of the contract stated, in pertinent part, as follows:

"5. Conditions Precedent to Closing

(a) The following are conditions to closing for [Blackhawk's] benefit, unless they are waived by [Blackhawk] *** in writing prior to Closing: (i) [Stanton] shall not be in default of any *** covenant or obligation under this [contract], (ii) *all of [Stanton's] representations and warranties set forth in this Agreement shall remain true and correct in all respects as of the Closing Date*, *** (v) [Stanton] shall obtain an estoppel certificate dated within ten (10) days of Closing (the "Tenant Estoppel Certificate") *** from each tenant under every Lease in a form reasonably acceptable to [Blackhawk] and [Blackhawk's] lender *disclosing no material*

*defaults* thereunder and no terms which are materially different from Leases delivered to [Blackhawk].

(b) Upon failure of any of the foregoing conditions precedent, [Blackhawk] may terminate this [contract] and [Blackhawk] shall be entitled to a return of the Deposit and all obligations under this [contract] shall terminate. Notwithstanding the foregoing, if a condition precedent to [Blackhawk's] obligations to close shall fail by virtue of a default by [Stanton] of an express obligation under this [contract], then [Blackhawk] reserves its rights on account of such default.

(c) As used herein, the term [']Material Adverse Change['] shall mean an adverse change in the Property, the income generated or to be generated from the Property and/or the expenses to be incurred in operating the Property, including (without limitation) if any of the followings occurs with respect to any single tenant or group of tenants comprising at least 10% of either the occupied space of the Property or the gross rent of the Property: (i) ceasing operation from the Property (*i.e.* going "dark"); (ii) *monetary default under or termination of their respective Leases*[;] (iii) the announcement that it shall be closing its store at the Property or that it has or intends to file for bankruptcy; or (iv) a material adverse change in the credit worthiness of such tenant(s). Any announcement shall be based upon correspondence or an announcement from such tenant or an otherwise credible or verifiable source including media announcements."  (Emphases added.)

Paragraph 5(d) provided, in pertinent part, that the failure of any of the foregoing conditions precedent entitled Blackhawk, at its option, to terminate the contract without liability.

¶ 9      Paragraph 7 addressed prorations at closing. Notably, paragraph 7(a) required the parties to prorate all rents under the leases collected prior to closing but specified: "The parties shall *not* prorate any [r]ents which are *past due* as of Closing ***." (Emphasis added.)

¶ 10     Paragraph 9 of the contract stated as follows:

> "Seller Representations and Warranties. [Stanton] makes the following representations and warranties as of [November 21, 2013,] and again as of [January 16, 2014,] as follows (and all of which shall survive the Closing for a period of [12] months (the [']Survival Period[']) and not be merged into the Deed):
>
> ***
>
> (c) As of [November 21, 2013], the only Leases in effect with respect to the Property are those leases described on the rent roll attached hereto as EXHIBIT C and such rent roll is true and correct in all material respects. There is no default on the part of [Stanton] as landlord under the Leases and the Leases are is [*sic*] in full force and effect. *To [Stanton's] knowledge, there is no default on the part of the tenants under the Leases.* [Stanton] has delivered a true and correct copies [*sic*] of the Leases to [Blackhawk]." (Emphasis added.)

¶ 11     Finally, paragraph 10 of the contract delineated "post closing rights," namely that Blackhawk had the right to bring "any action" against Stanton "as a result of any untruth or *inaccuracy* of representations and warranties" made under the contract, if "such truth or inaccuracy is material" and Blackhawk did not, prior to closing, "discover or learn information (from whatever source) that contradicts any such representations and warranties, or renders any such representations and warranties untrue or incorrect." (Emphasis added.)

¶ 12                              B. Disclosures and Representations

¶ 13    After the parties signed the contract, Stanton delivered to Blackhawk certain due-diligence materials pursuant to paragraph 4 of the contract, including operating statements and leases. Blackhawk requested additional information reflecting income for the building, including "historical rent collections" for each space from 2011 through 2013. Stanton's attorney did not believe the information was required under the contract but asked Stanton if the information could be provided, and, ultimately, forwarded to Blackhawk reports relative to income from the building. Relevant here, on December 5, 2013, Stanton delivered "income by tenant" summaries for 2011, 2012, and 2013. The summary for January 1 through December 3, 2013, reflected $204,100 in income from Urban Grille. As the *annual* rent due under the lease was $204,350, the summary reflected a difference of only $250.

¶ 14    A few days before the closing, David observed a sign on the door of the Urban Grille that stated, "Closed for the month of January." He also observed that the restaurant was not operating that day but that the utilities were on and the furnishings were in place. Blackhawk inquired with Finley about the sign and was told that it was Urban Grille's normal practice to close in January. Stanton later admitted that he was asked by Finley about the sign and advised him that EAT had on occasion closed the Urban Grille at certain times in previous Januarys.

¶ 15    On January 15, 2014, Robert, as president of EAT, signed a "tenant estoppel certificate," as required by paragraph 5(a) of the contract. Stanton admitted that he helped obtain Robert's signature on the certificate and delivered it to Blackhawk but denied that he prepared it. In the certificate, EAT represented, in pertinent part, that it was current on rent through January 2014 and was "open for business and in operation in the Premises." Additionally, EAT represented it understood that Blackhawk was financing the purchase and that Blackhawk's lender was relying on the representations and warranties contained in the certificate.

¶ 16    The sale closed on January 16, 2014.  At the closing, pursuant to section 7(a) of the contract, Stanton prorated the rent that he had purportedly received in January 2014.  Specifically, Blackhawk received $17,257.82 as a credit against the purchase price, including $8,925 for the January rent that Stanton *purportedly* collected from EAT.

¶ 17    After closing, EAT never resumed its operations.  On February 1, 2014, it informed Blackhawk it had permanently closed the Urban Grille.  On February 4, 2014, Robert emailed David "to explain [his] current situation."  Robert stated that EAT had "every intention" of reopening the Urban Grille in February.  He explained, however, that he had been diagnosed with degenerative cervical spine disease and, in January 2014, he was in a head-on collision that "made [his] situation much worse," rendering him unable to be an active part of the restaurant. Thus, the Di Pasquantonios decided to try to sell the Urban Grille.  That same day, Blackhawk served upon EAT a 10-day notice pursuant to the lease.  On February 25, 2014, Blackhawk commenced forcible entry and detainer proceedings (Kane County case No. 14-LM-326) and later obtained a money judgment and order of possession.

¶ 18    On August 25, 2014, the Di Pasquantonios petitioned for relief under Chapter 7 of the United States Bankruptcy Code (11 U.S.C. § 701 *et seq*. (2012)).  As part of their filing, the Di Pasquantonios listed Blackhawk as a creditor.  They did not list Stanton.  On April 2, 2015, the Di Pasquantonios sat for a Rule 2004 examination (Fed. R. Bankr. P. 2004 (eff. Dec. 1, 2002)). During the examination, Robert maintained EAT had paid all rent due to Stanton through January 2014.  Robert testified the Urban Grille was having difficulties in 2013.  It was not making money. However, he maintained that Urban Grille always paid rent in full, even if late or in multiple payments. Robert also testified that, beginning in "probably" 2010 or 2011, it was their normal practice to close in January and Stanton knew this.  Robert explained, "with business *** it was

better to close [in January] and open after the Superbowl." Jeanette, however, could not recall whether Urban Grille was open in January 2011, 2012, or 2013.

¶ 19    Robert also explained he signed the tenant estoppel certificate, which stated EAT was "open for business and operating," because EAT intended to reopen. He stated that, at the time, EAT was current on its rent. However, in light of his medical condition and EAT's inability to afford a manager, EAT would close. When asked when the Di Pasquantonios made the decision to close Urban Grille, he responded, "December January time frame." Further, when asked whether his neck condition had been diagnosed before he signed the certificate, Robert answered, "I think so," but he could not be sure. At no time did he tell Stanton about his neck problems "because [it was] not [Stanton's] business."

¶ 20    About a year later, in January or April 2016, Blackhawk received EAT's bank records. It was at this time that Blackhawk learned EAT paid no rent to Stanton after a partial payment in October 2013. Those records also showed that EAT had a steady flow of deposits and withdrawals throughout the months of January 2011, 2012, and 2013. All other records of EAT's operation of the Urban Grille were maintained electronically but were either lost or destroyed before the Rule 2004 examination.

¶ 21                          C. Complaint and First Appeal

¶ 22    Blackhawk sued. In sum, in its amended complaint, Blackhawk sought recission of the real estate purchase contract based on fraudulent inducement (count I) and mistake of fact (count II) and money damages based on fraudulent inducement (count III) and breach of contract (count IV). Blackhawk alleged that EAT accounted for approximately 40% of the building's rental income. Before October 2013, EAT began suffering a significant decrease in business and income. It paid partial rent in October 2013 and then, Blackhawk alleged, EAT told Stanton it intended to

cease operations. Anticipating the sale of the property and that the loss of EAT's tenancy would negatively affect its value, Stanton entered into an agreement with EAT to hide from Blackhawk its intent to close and represent falsely that it was operational and current on its rental payments. As part of that agreement, Stanton agreed to allow EAT to continue operating without paying rent until the sale closed and forgave past due and future rent. In return, Blackhawk alleged, EAT agreed to present itself as operational, by, among other things, continuing operations through December 2013, executing the tenant estoppel certificate, and representing that it had closed in prior Januarys.

¶ 23    Blackhawk also alleged Stanton, to induce Blackhawk to enter the contract, made the following material misrepresentations: (1) representing, in paragraph 9 of the contract, "there [wa]s no default on the part of the tenants under the Leases" assigned to Blackhawk, thereby implying EAT had paid all rents due under the lease; (2) preparing and obtaining Robert's signature on the estoppel certificate and delivering it to Blackhawk, thereby representing that EAT was current in its rental payments; (3) representing that Urban Grille's closure in January 2014 was temporary and that it had regularly closed in prior Januarys due to decreased business and vacations; and (4) representing that EAT was a fully operational and paying tenant. In relation to counts I and III, Blackhawk alleged Stanton knew those representations were false when he made them. In relation to count II, Blackhawk alleged that, even if Stanton did not know the representations were false, they were mistakes of fact justifying recission. In relation to count IV, Blackhawk alleged the misrepresentations constituted material breaches under paragraph 10 of the contract. As for damages, Blackhawk alleged it was damaged: (1) $422,212 for lost rents while EAT's unit was vacant; (2) $302,179 for lost rents when the unit was rented at an amount less than the rent EAT had been required to pay in its lease; and (3) alternatively, in the amount equal to the

difference between the fair market value that Blackhawk paid for the property as represented by Stanton and the actual fair market value of the property at the time of closing "without the rents EAT was falsely claimed to be making." Further, Blackhawk sought punitive damages for the fraud claim, as well as attorney fees.

¶ 24 Stanton answered the complaint and asserted three affirmative defenses. First, Stanton asserted a one-year contractual limitation period, contained in paragraph 9(c) of the contract, barred Blackhawk's claims. Second, he contended paragraph 18(c) of the contract was an integration/no-reliance clause that barred Blackhawk's claims, because those claims were "based on extra-contractual statements, representations[,] and warranties not contained in the [contract]." Third, he contended Blackhawk failed to mitigate its damages. We note that, in requests to admit, Blackhawk asserted that EAT's monthly rent was a material factor in the property's fair market value at the time of closing, and Stanton "agreed that rent, among other factors[,] are material factors."

¶ 25 Both parties moved for summary judgment. The materials attached to the parties' motions demonstrated that, until October 2013, EAT generally paid full rent each month, though sometimes it was late or paid rent in parts. Days before his deposition, in November 2019, Stanton produced copies of checks that he had received from EAT. Those checks, dated October 1, November 1, and December 1, 2013, were written for the full amount of rent due those months, and, on the memo line, stated they were for October, November, and December 2013 rents, respectively. At his deposition, Stanton testified that he never attempted to deposit those checks because EAT did not have sufficient funds. Stanton explained, "back then, you could call the bank and ask if a check would be good ***. So, we just checked everyday and they were never good and eventually the account was closed." Nevertheless, Stanton did not believe EAT had defaulted under the lease,

explaining it was not "unusual for us to sit on checks for tenants. We would call the bank and when there was money in there, we would deposit them." He believed the checks would eventually clear but never told Blackhawk he had not yet deposited them because there were insufficient funds in EAT's account. In her affidavit, Susan averred EAT had sufficient funds to cover at least one of the checks on 12 days in December 2013. A "deposit detail" that Stanton produced in the litigation confirmed that Stanton did not make any deposits of EAT's rent after an October 1, 2013, deposit of $9,000.

¶ 26 Blackhawk attached to its motion an affidavit from Steven Niedholdt, a remodeling contractor who had previously done work at the property. He averred that, in November 2013, he was in Stanton's office at the property. At that time, Robert came into the office and told Stanton he intended to permanently close the Urban Grille because he had severely injured his back in a car accident and was unable to work. Stanton told Robert that, because he had listed the property for sale, he needed Robert to keep Urban Grille open until the sale closed. Robert agreed. In his affidavit, Stanton denied that Niedholdt was ever on the premises in November 2013 and that this conversation ever took place. He also denied that he and EAT had entered into any agreement for the purpose of defrauding Blackhawk.

¶ 27 The trial court granted, in part, the parties' motions, and both parties filed cross-appeals. In our decision, we (1) dismissed, in part, plaintiff's appeal, (2) dismissed defendant's cross-appeal in its entirety, and (3) otherwise reversed and remanded. *Blackhawk*, 2022 IL App (2d) 210452, ¶ 107. In short, we concluded that the 12-month limitations period in paragraph 9(c) did not bar Blackhawk's claims because section 13-215 of the Code of Civil Procedure (Code) (735 ILCS 5/13-215 (West 2018)) allowed, in circumstances of alleged fraudulent concealment, claims to be

brought within five years after discovery;[3] here, there existed material factual questions as to whether Stanton fraudulently concealed the action and, if so, the claims would therefore be timely. *Id.* ¶ 105. Further, we explained that, although, generally, misrepresentations that form the basis of a cause of action cannot also constitute fraudulent concealment under section 13-215, here, the alleged preclosing misrepresentations also tended to conceal the claims. *Id.* ¶ 101. Moreover, we rejected Stanton's suggestion that, because paragraph 10 of the contract set forth the ability to bring actions for untruths or inaccurate representations or warranties, Blackhawk should have, through the exercise of ordinary diligence, discovered its claims within one year of closing. *Id.* ¶¶ 97-98. Specifically, and while paragraph 10 of the contract was not presented as the primary clause at issue on appeal, we held,

> "[P]aragraph 10 also states that Blackhawk had the right to bring an action only if, prior to closing, it did not discover or learn information that contradicted Stanton's representations or rendered them untrue or incorrect. Stanton's argument assumes that Blackhawk learned or discovered the falsity of the representations before closing, but he offers no explanation as to how Blackhawk could have done so." *Id.* ¶ 98.

¶ 28                                    D. Trial

¶ 29    The court held a four-day bench trial in January and February 2023. Susan Wagenaar testified that Blackhawk purchased the property on January 16, 2014. Susan noted that the

---

[3]Specifically, section 13-215 provides:

> "Fraudulent concealment. If a person liable to an action fraudulently conceals the cause of action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards." 735 ILCS 5/13-215 (West 2018).

agreement required Stanton to produce due diligence materials, including operating statements. He produced the required materials but, in her mind, operating statements would have included both income and expenses. Since Stanton provided only expense information, Blackhawk separately requested income information. Stanton thereafter produced an "Income By Tenant" summary for the years 2011, 2012, and 2013. Susan testified that the summary for 2011 reflected Urban Grille paid around $18,000 less than the lease required, and, in 2012, paid around $14,000 less than the lease required. She assumed those issues were resolved by 2013, however, as the summary for January 1 through December 3, 2013, reflected income for Urban Grille in the amount of $204,100, which was close to the entire amount required under the lease. Susan testified the income-by-tenant summary document influenced the decision to purchase the property; specifically, the restaurant was responsible for half of the property's income and, if Blackhawk had known that Urban Grille had not paid rent in October, November, or December 2013, "we couldn't have paid. I don't think the bank would have given us the loan. I don't think that would have been an option but to pull out[.]"

¶ 30    In addition, the January 14, 2014, estoppel certificate from Urban Grille had a "huge" effect on Blackhawk's decision to close on the property two days later. Specifically, Finley, the parties' joint broker, let the Wagenaars know that the restaurant was not operating in January 2014; however, he told them that this was normal or that it was always closed in January, due to slow business and vacation time. Thus, Blackhawk relied upon EAT's estoppel certificate, which Blackhawk delivered to its lender for the closing, as the certificate represented that, as of January 15, 2014, Urban Grille was "open for business and in operation in the [p]remises." Susan agreed that the estoppel certificate was a representation from Robert, the tenant who signed it, not from Stanton. However, she believed that, to the extent it stated that EAT was current with respect to

rent, Stanton knew the certificate to be false, as he had not deposited approximately $52,000 in checks from EAT because he had called the bank and learned that there were insufficient funds.

¶ 31    Finally, Susan testified that the closing statement included a prorated rent payment for rent Stanton purportedly received from EAT for January 1 to 16, 2014; however, no check or deposit had been produced reflecting EAT ever made a January 2014 rent payment. She testified that, if the prorated rent from EAT for January had not been included at the closing, Blackhawk would not have completed the sale.

¶ 32    Susan testified that she visited the premises on January 18, 2014, after the closing, and it did not appear that the restaurant was closed permanently; there was a sign in the restaurant window reflecting that it was closed for January, but the equipment and tables and chairs remained and there was "salt and pepper on the table." However, on February 1, 2014, EAT notified Blackhawk that the business was closing. Ultimately, the Di Pasquantonios personally filed for bankruptcy and, in the course of those proceedings, in April 2016, Blackhawk discovered that EAT's October, November, and December 2013, rent checks had not been deposited. Those checks were physically produced by Stanton immediately prior to his deposition in this case. Susan testified that, until that point, Blackhawk had no way of knowing that EAT had not paid rent to Stanton from October 2013 through January 2014. Further, she explained that, although EAT's bank statements reflected that EAT would sometimes pay rent in installments, or the payments would be cashed at different times when the checks were produced, the information did not reflect that rent checks were simply held and not cashed. Finally, the statements did not appear to reflect that the restaurant had closed in prior Januarys.

¶ 33    In sum, when asked how Blackhawk would have responded, if it had been informed at closing that the restaurant had not paid rent since October, Susan replied that it "would not have

followed through with the closing. *** We would have had to stop the sale." When asked why Blackhawk would have stopped the sale, she explained that a lot would have depended on the bank, as she doubted that it would have given Blackhawk the loan, if EAT had not paid rent and was closed. Further, Susan testified that, had it known EAT had not paid rent and was closing, Blackhawk could have "regrouped" or sought an appraisal. She agreed that the bank never stated that it would not issue the loan if the restaurant was not operating, nor did Blackhawk ask the bank that question, but Susan explained that Blackhawk had a down payment of only $1,000,008 and, if the bank did not provide the loan, Blackhawk could not have closed on the purchase. When asked whether, in retrospect, Blackhawk should have asked for additional due-diligence materials, Susan testified that it might have asked for more detailed income information, in order to verify deposits were actually being made. When the idea was raised with Blackhawk's attorney, he did not believe that Stanton would be willing produce his bank statements. Their attorney instead suggested requesting tax returns, but Susan thought a 2012 tax return would be too dated, and it was too early to request a 2013 return. Accordingly, and in part because they did not want to jeopardize a working relationship with Stanton after the sale by implying the information he had produced was not truthful, they did not request either bank statements or tax returns.

¶ 34     Susan testified that Urban Grille's closure impacted the Wagenaars financially, and they spent all of their savings, cashed out their life insurance, and sold their primary home. She testified that it took around 17 months to re-let the space left vacant by EAT, the first tenant after EAT paid $7,000 in monthly rent, for only part of the space, and that, when a new owner later came in, rent was reduced to $5,000 monthly.

¶ 35     David Wagenaar's testimony was largely consistent with Susan's. He, too, reiterated that, because the restaurant provided close to 50% of the property's income and comprised more than

30% of the space, its rental income was important to Blackhawk's decision to close on the purchase. David agreed that income from EAT was necessary to satisfy Blackhawk's initial mortgage payments. According to David, Blackhawk was told that EAT always paid the rent, even if it sometimes paid rent a little late. David agreed that the first evidence received reflecting that EAT had not paid its rent leading up the closing was in 2016, during the Di Pasquantonios' bankruptcy proceeding. He testified that, if the income-by-tenant summary statement that Stanton provided had reflected that EAT had not paid rent for the last three months of 2013, Blackhawk would not have closed on the sale. Similarly, if David had seen the three uncashed checks that Stanton held at the time of closing, Blackhawk would not have proceeded. If David had known the estoppel certificate was false, where it stated EAT's rent was current through January 15, 2014, Blackhawk would not have closed on the sale, and he believed that the bank also would not have proceeded. Similarly, if the closing statement had reflected that EAT had not paid rent in January, instead of Stanton prorating the rent as though it *had* been paid, David would have stopped the sale until that issue was resolved. David had understood that the rent rolls Stanton produced during the due diligence phase represented the rents that the tenants were obligated to pay, whereas the income-by-tenant summary statement reflected what was actually paid. Indeed, he agreed that the rent rolls would not necessarily show what was paid, which was why Blackhawk requested income statements. David testified that, before the closing, Finley let the Wagenaars know that the restaurant had a sign in the window reflecting it was closed for January. However, Finley told them that, according to Stanton, it was normal for Urban Grille to be closed for the month of January. Prior to 2016, Blackhawk had no actual evidence that Stanton had not been truthful in his representations concerning EAT's payment of rent.

¶ 36    Blackhawk called Steven Niedholdt, who testified that he had been a carpenter for around 30 years and he had worked on the property for Stanton. He testified that, in October or November 2013, he overheard a conversation between Robert and Stanton whereby, because of a possible car accident that hurt Robert's back and caused so much pain that he could not continue working, EAT would close Urban Grille. Stanton wanted Robert to keep the restaurant open until the property sale closed. Niedholdt conceded that, while, in 2018, he signed an affidavit, stating that Robert had *agreed* with Stanton's request to keep the restaurant open until after closing, four years later, in 2022, he stated in his deposition that there was no agreement, in that he never heard Robert *agree* to keep the restaurant open. Niedholdt explained the discrepancy by testifying that he was nervous at the deposition and Stanton's attorney "badgered" him. At trial, Niedholdt reiterated that, when he was working in Stanton's office, he heard Stanton and Robert *agree* to keep the restaurant open until the sale.

¶ 37    Stanton testified, in part, to his extensive experience in commercial real estate development, as well as his recognition for contributions to the City of Geneva. In general, in 2013, tenants dropped off rent checks in his office within the building. With respect to the October, November, and December 2013 rent checks, he was asked, "You knew prior to the closing that EAT had not made good on three checks and paid nothing in January, correct?" Stanton answered, "yes." However, Stanton did not terminate EAT's lease or give it a notice of default. He explained that, with respect to the three rent checks, "I didn't start thinking they were non-collectible until February when they didn't open back up for business." Because he thought there remained a chance he would receive the money, he did not believe that EAT was in default until it later declared bankruptcy. He never asked EAT for partial payments, instead of simply holding the checks, because doing so would suggest that a partial-payment procedure was appropriate.

Nevertheless, there were occasions in the past where he had accepted partial payments from EAT and the restaurant would, for example, drop off partial payments or, possibly, two checks, asking that one not be cashed until a later date. Stanton explained that payment fluctuation is very common in the restaurant industry, and people who know the restaurant business would understand that holding the checks "was not as big a deal as we're making" it. Further, the lease started in 2006, and, as of the end of September of 2013, EAT was current with the rent it owed during that seven-year period.

¶ 38     Stanton testified that it was possible that he held onto the three checks in accordance with his accountant's end-of-year advice. However, Stanton also agreed that, regarding these three checks, he would have called the bank every few days to see if they would clear, and he admitted that, in his deposition, he testified that he called the bank about the checks to see if there were insufficient funds and that he never deposited them. Stanton agreed that he did not consider rent paid, if the check was not good. Yet, he never emailed or followed up with EAT to ask about the bad checks for October, November, or December 2013.

¶ 39     Stanton essentially testified that the amount of rent owed (over $51,000) was not a large figure, when compared to the sums with which he regularly deals. As such, he was not sure how frequently he telephoned the bank about the bad checks, he thought EAT would catch up on the payments, and he was not concerned about Blackhawk walking away from the deal. Specifically,

> "COUNSEL: I understand that to you $51,000 is a business expense and is not a big deal. But if you were selling a building for close to $4 million and if you had informed the buyers that EAT, your main tenant, stopped paying rent in October of 2013, you were concerned they would walk away from the transaction, weren't you?
>
> STANTON: I couldn't make any assumption on that.

COUNSEL: I didn't ask you to make an assumption. I asked were you concerned they would walk away if you disclosed to them the fact that you were holding $51,000 in checks and EAT didn't even give you a bad check in January, no rent at all.

Weren't you concerned if you disclosed the truth to them, they would not have—they would have walked away from the deal which pocketed you a lot more than $51,000?

STANTON: You know, I didn't have any great concern and it definitely wouldn't have cost me that kind of money. We had two other buyers that were actively pursuing the purchase. One of the two buyers we actually sold the theater building right cross the street for over $4 million.

\*\*\*

So—so no, I wasn't, you know – I'm a sophisticated seller, and I wasn't—I'm a sophisticated landlord and I wasn't overly worried. This is just stuff you do in everyday business."

Stanton explained that, because he had other buyers waiting in the wings, when he learned about the sign in the window reflecting that EAT was closed for January, he asked Finley to find out if there was a problem. However, Finley told him that EAT had paid for its 2014 Chamber of Commerce dues and its liquor license had been renewed.

¶ 40    Stanton nevertheless agreed that he knew, prior to closing, that he was holding three bad checks for over $51,000. He agreed that, if he had been the buyer, he would have wanted to know about the checks, but that he never told Blackhawk that he was holding the three rent checks. Stanton explained that he did not disclose the three checks to Blackhawk prior to the closing because "I had no reason to believe I wouldn't collect on those checks." Stanton agreed that

Blackhawk was "very, very thorough" and had requested "a lot more than most people do." However, he maintained at trial,

> "There was nothing that I knew that the buyers didn't know except for the fact that the checks weren't cashed yet for rent. Other than that they knew what I knew. There was nothing, you know, there was nothing that all of a sudden it's like, God, I better share this, you know. *** [B]esides the fact that I still had three checks that didn't clear, there was nothing else that they didn't know that I knew."

Stanton agreed that paragraph 5(c) of the contract required him to disclose all material adverse events. He testified that he had not been aware of anything that would have implicated that paragraph, but, ultimately, agreed that the term "monetary default" in paragraph 5(c) would include non-payment of rents. Stanton testified that he did not know why there was no rent check from EAT for January 2014.

¶ 41 With respect to the income-by-tenant summary, Stanton testified that it was probably prepared by his bookkeeper, Debra Draus. He explained that the summary reflected an overview of what should have been paid by each tenant between January 1, and December 3, 2013, under the terms of the lease. Specifically, it listed rent amounts, not deposits, and had "nothing to do with rent payments." Ultimately, Stanton could not point to a document that he produced to Blackhawk prior to closing that disclosed rents actually deposited for each tenant.

¶ 42 Regarding EAT's closure, Stanton was asked, "[y]ou also knew that there was a closed for January sign on the door prior to the closing, correct?" He answered, "yes." However, Stanton had high confidence in EAT and had no reason to think it would stop operating:

"COUNSEL: Leading up to September or even October, November, or December until the sign was posted on the door sometime in January of 2014, did you have any reason at all to believe that EAT Restaurant Group was going to close its doors?

STANTON: No, I didn't, just the opposite with that. We won't do marketing work [for] tenants but because we were selling the building, they knew we were selling the building, we started doing marketing work for them. And [Draus] was dealing with [Robert's] wife on a daily basis doing marketing for them. We did marketing for the holidays, for gift cards. We started doing work for Valentine's Day. You know, we did email blasts for the chamber newsletter for their new menu that was going to take off in the new year. We actually designed and got approval from the historic preservation in the city for new signage. So [Draus] was working with them diligently for their next year's marketing at the time. We had no reason to believe [it would close]."

Stanton continued that EAT paid for that marketing, and he could think of no reason a restaurant would pay for the marketing if it intended to close.

¶ 43    Finally, Stanton testified that he had no contact at all with EAT or the Di Pasquantonios after the closing. He explained that he did not pursue them as a creditor in bankruptcy because he did not think he would recover, as he also knew, before the January closing date, that they had a second restaurant that had closed and that they had a large judgment against them. He did not scheme or agree with the Di Pasquantonios to defraud Blackhawk, the conversation that Niedholdt claimed to have overheard never occurred, and Niedholdt did not do any work for him in the alleged time frame. Rather, Stanton testified that he never had a conversation with Robert in which Robert said he was closing the restaurant, or where he discussed his sale of the building and Robert keeping the restaurant open.

¶ 44    Draus testified that she has been employed by Stanton as his bookkeeper for more than 24 years. Draus uses the program Quickbooks to maintain Stanton's accounts, and only she and Stanton have access to the computer where she maintains the books. Tenants dropped off rent checks in the office, and she would enter rent payments in Quickbooks when the checks were deposited. When searching for documents pursuant to discovery requests for this case, Draus pulled the "closing file" from the sale. The three rent checks that Stanton had been holding for EAT were in that file; she did not know Stanton was holding the checks. When shown the income-by-tenant summary, she explained that the top portion of the document looked like the Quickbooks format, but the bottom portion did not. She did not recall preparing that document, but "probably" did. Draus agreed that, even though the document was titled "income," it more accurately reflected a rent roll. If she had prepared a deposit detail for the period after October 1, 2013, it would have shown no deposits from EAT. According to Draus, Niedholdt did not do any work in the office or reception area in October, November, or December 2013. Moreover, when Robert dropped off the estoppel certificate in January 2014, he apologized that he was dropping it off late and he explained that he had been in a car accident.

¶ 45    Douglas Cuscaden testified that he is the attorney who represented Stanton in the sale transaction. He explained that he had known Stanton for around 20 years, he was an active member of the business community, and he had always been honest and truthful throughout their work together. He explained that Stanton produced *numerous* documents and answers in response to Blackhawk's requests and questions and that the list of due diligence documents attached to the contract did not require delivery of income statements. Cuscaden testified that, when he wrote to Stanton regarding Blackhawk's request for "historical rent collections," he placed quotation marks around the phrase because it was not a term of art or phrase that typically arises in sale transactions.

Upon further questioning, Cuscaden testified that he understood the phrase to refer to "how much each of the tenants had paid as and for rent during the years he noted" and that "rent collections to me would likely mean how much you have collected for rent from your tenants." When asked if the income-by-tenant summary was Stanton's response to that request, he testified "it could be." Cuscaden did not know that Stanton was holding three rent checks from EAT, nor that EAT paid no rent in January. Specifically, when asked if he knew that EAT had not paid January rent, Cuscaden said "no" and "I recall that we gave a tax proration for their leased amount prorated, *** for January. So I guess I had assumed they paid rent." Cuscaden was asked whether he would have been obligated to inform Blackhawk, if he knew that Stanton was holding three rent checks from EAT and that it had not paid rent in January, and he responded that he would have to check the contract, but his guess was "probably yes." He noted, however, that Stanton had produced the due diligence documents required by the contract, as well as additional materials when asked, but the contract did not specify he was required to deliver income statements or "historical rent collections."

¶ 46    The parties both called witnesses to testify regarding damages. Blackhawk presented John Orin, who testified that he had been a real estate appraiser for 43 years. Stanton stipulated to Orin's qualifications as an expert. Orin testified regarding the appraisal he prepared at Blackhawk's request concerning the property's value as of January 16, 2014, without EAT as a tenant. In sum, Orin testified to his methodology and ultimately opined that the fair market value of the property, as of January 16, 2014, without EAT as a tenant, was $2,485,000.

¶ 47    Stanton, in turn, presented Mark Munizzo as a witness. He had been a real estate appraiser for 45 years and he, too, was accepted as an expert witness without objection. Munizzo did not perform his own appraisal; rather, he reviewed four appraisals of the property, including Orin's,

and essentially stipulated to what the other appraisers did in order to determine which was the most relevant and credible assessment. Munizzo viewed the appraisal as being one of a fee simple estate. Ultimately, after critiquing Orin's approach, Munizzo opined that the "benchmark" minimum value of the property, based upon the data he collected from the four appraisal reports, was at least $4,000,000. He reached that benchmark by reconciling two of the other appraisals, concluding that the property was "probably worth *** at least $4 million" as of the closing date of January 16, 2014. However, Munizzo did not use an assumption or hypothetical that EAT was not paying rent at the time of closing.

¶ 48    The parties moved to conform the pleadings to the proofs, and the court granted the motion. Instead of closing arguments, the court accepted written argument and proposed findings of fact and conclusions of law. In Stanton's submission, he acknowledged that, at closing, Blackhawk received, as a proration of January 2014 rent, a $17,257.82 credit against the purchase price and that figure included $8,925 for EAT's January rent. However, Stanton made no other reference or argument concerning the prorated rent at closing. With respect to the three held rent checks, Stanton urged the court to find as follows:

> "The Court is well aware that any buyer of commercial real estate wants to know
> as much as possible about the asset it is buying, and of course the income stream and the
> status of the existing tenant's rent payments are an important, even crucial, component of
> the asset. The Court believes that whether or not Stanton was concerned about the checks,
> he likely *should have* disclosed their status of being unpaid. However, the Court cannot
> say they were *required* to be produced under the terms of the Contract, in addition to the
> materials that were expressly requested and provided under those express terms. The Court
> notes that Blackhawk had a right under Paragraph 4 to simply terminate the transaction if

it felt it had not been provided the materials it was entitled to, and it is unfortunate that Blackhawk's prior counsel discouraged it from requesting the bank records that would have shed light on the rent payments and possibly avoided what has been a costly experience for both Parties. Ultimately, because the Court has determined herein below that Blackhawk cannot establish damages even in the event of a breach, the issue does not control the Court's decision." (Emphases in original.)

¶ 49                                     E. Trial Court's Judgment

¶ 50    On July 24, 2023, the trial court issued a written ruling, granting judgment in Stanton's favor on all of Blackhawk's claims. The court found two critical issues operated to render others "moot;" namely whether Stanton: (1) fraudulently concealed knowledge of EAT's "plan" to break its lease to induce Blackhawk's principals to close the sale; and (2) breached his sales contract with Blackhawk. It noted that both emanated from an alleged conspiracy between Stanton and the Di Pasquantonios.

¶ 51    Addressing fraud first, the court stated, "[w]hile [Blackhawk] points to a number of factors evidencing fraud and fraudulent concealment, the Court finds none of those facts, individually or together[,] sufficient without the testimony of Steven Niedholdt." It then explained that it discounted Niedholdt's testimony as lacking credibility and unsupported. Specifically, although Niedholdt testified that, in October or November 2013, he overheard Stanton and Robert agree to conceal until after the January closing that Robert was closing Urban Grille due to an auto accident, the court found Niedholdt was not credible, "was nervous and agitated to the point that he was visibly shaking," was impeached by his deposition testimony, and was "defensive and combative[,] making unbelievable excuses for his inconsistent testimony. He was not believed by the Court." In contrast, the court noted, Stanton denied any such conversation, and Draus testified not only

that she never overheard such a conversation, but that no work was performed in the office during that timeframe. Further, both Stanton and Draus testified that they had ordered new signage and were doing marketing work for Urban Grille near the end of 2013, which would have been an unnecessary expense had Stanton known it was leaving. Robert, in his deposition testimony, also denied any such conversation and stated that his decision to close the restaurant did not occur until following his auto accident in January 2014, when he reinjured his back, rendering him incapable of managing the business. The court found that it would have been "relatively easy to determine whether Robert's auto accident occurred in January, before the date Niedholdt allegedly overheard the conversation, or at all, however, no such evidence was presented." Finally, the court found: Draus an "extremely credible witness;" Cuscaden (Stanton's attorney at the sale) "highly credible;" Stanton "credible;" and Blackhawk's principals, David and Susan, "credible." For these reasons, "and for the additional reasons cited in Stanton's post trial submission," the court did not find fraud or fraudulent concealment and it entered judgment for Stanton on counts I and III. It also explained that the failure to prove fraudulent concealment provided a basis to dismiss *all* counts, based upon Stanton's affirmative defense of the contractual one-year limitations period, and, consequently, it entered judgment for Stanton on counts I through IV. It also entered judgment in Stanton's favor on counts I and II on the basis that those counts sought recission of the sales contract, but it found insufficient evidence presented at trial to show that the parties could be returned to their presale status, more than nine years post sale, as well as "for the specific reasons set forth in [Stanton's] submission."

¶ 52 The court further addressed the breach-of-contract claims, noting that it had to determine whether Stanton failed to comply with a contractual term to Blackhawk's financial detriment, the primary evidence of that claim centering on three checks Stanton received from EAT, but had not

cashed, while showing EAT current on the rent rolls. The court found, "[w]hile Stanton most probably should have disclosed the information that he was holding these checks, EAT was not *technically* in default for those months pursuant to the language in its *lease until Stanton had sent a notice of default*." (Emphases added.) The court found no breach of contract.

¶ 53 Finally, the court noted that, based on its foregoing findings, it did not need to consider damages. Nevertheless, it found not credible Blackhawk's damages evidence. Specifically, it noted that each party presented a well-qualified expert to opine on the damages question, *i.e.*, "the value of the property with EAT and without EAT." It found Munizzo's testimony was "far more credible," in that it pointed to a valuation that was greater than the actual sales price. In contrast, it found Blackhawk's expert, Orin, provided valuation testimony that was,

"at best, speculative and at worst unbelievable. The idea that the building loses *nearly half* of its sales value with the loss of a tenant leasing 34% of the space is incredible considering the fact that any tenant may leave post-sale at any time due to a multitude of possible reasons, including world-wide pandemics. Considering that a tenant may leave the day after closing for a multitude of reasons, it makes no sense that having the tenant in place the day before nearly *doubles* the value of the property." (Emphases added.)

¶ 54 The court entered judgment in Stanton's favor on all counts and dismissed the amended complaint with prejudice.

¶ 55 F. Attorney Fees and Costs

¶ 56 As the prevailing party, Stanton petitioned for attorney fees and costs. On November 27, 2023, after a hearing and reviewing the parties' briefs, the court discounted Stanton's request by $8,380. However, it found the remainder of the request reasonable and awarded Stanton $111,270.50 in attorney fees and costs.

¶ 57    Blackhawk appeals.

¶ 58                        II. ANALYSIS

¶ 59                     A. Motion to Strike

¶ 60    Preliminarily, we address Stanton's motion to strike portions of Blackhawk's reply brief, which we ordered taken with the case. Stanton takes issue with Blackhawk's suggestion that this court should make an inference that it took Stanton over 18 months to find a damages expert that would value the property at more than the purchase price. Further, Stanton objects that Blackhawk complains of a procedural error in the trial court that was not previously raised. Blackhawk, in turn, objects to Stanton's motion and, in sum, asserts that the challenged material merely responds to points raised in Stanton's response brief or constitutes valid argument.

¶ 61    We deny Stanton's motion to strike portions of Blackhawk's reply brief. To the extent this court need consider the challenged portions of the brief, we will disregard any arguments or inferences we deem inappropriate.

¶ 62                     B. Trial Court's Judgment

¶ 63    On appeal, Blackhawk abandons counts I and II seeking recission. However, it argues that we should reverse the court's judgment on counts III (fraud) and IV (breach of contract), enter judgment in its favor on those counts, award damages, and remand for further proceedings to determine the amount of attorney fees and costs it should receive (as the newly-prevailing party). Specifically, Blackhawk argues that the court's judgment was against the manifest weight of the evidence, where it fundamentally misrepresented Blackhawk's claims as being dependent on Niedholdt's testimony, when that testimony was, at best, simply corroborative of the documentary evidence and other testimony. Blackhawk argues that it sustained its burden of proof on both claims, given the testimony and evidence regarding (1) the three rent checks that Stanton held and

did not disclose, knowing that EAT had insufficient funds to make good on those checks and, therefore, not disclosing that EAT stopped paying rent in October 2013; (2) the closing statement, wherein Stanton prorated $8,925 as January rent from EAT, when EAT had not paid January rent; (3) the estoppel certificate that Stanton procured and delivered to Blackhawk signed by Robert, representing that EAT had paid all rents due under the lease; and (4) the "Income by Tenant Summary" delivered by Stanton in response to Blackhawk's request for historical rent collections, falsely representing that EAT had paid its full rent for 2013. Blackhawk argues that none of the foregoing misrepresentations or breaches, all of which are supported by the evidence, had anything to with Niedholdt and, therefore, the court's finding that the remaining evidence was "moot" and, consequently, its failure to even consider it or attribute to it proper weight requires reversal.

¶ 64    Stanton responds, in sum, that the trial court correctly weighed the evidence, particularly given the fact that no agreement or conspiracy was proved, other than one in which Blackhawk pursued evidence to support its fraud claim. He argues that, because no fraud was established, section 13-215 of the Code was not triggered and could not serve to circumvent the 12-month contractual period in paragraph 9 of the contract. Accordingly, he contends, the claims were time barred. Further, he notes that, even if not time barred, the court found that Blackhawk did not establish damages, defeating both claims.

¶ 65    For the following reasons, we agree with Blackhawk. We reverse the court's judgment and remand for a hearing to establish damages and attorney fees.

¶ 66                                  i. Standard of Review

¶ 67    At trial, Blackhawk bore the burden of establishing its common-law fraud claim by clear and convincing evidence. *Avery v. State Farm*, 216 Ill. 2d 100, 191 (2005). The burden of proving common-law fraud is higher than that of an ordinary civil case because the law generally presumes

that transactions are fair and honest. *Id.* Evidence is clear and convincing if it leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question. See *Metropolitan Capital Bank & Trust v. Feiner*, 2020 IL App (1st) 190895, ¶ 39.

¶ 68 In contrast, Blackhawk needed to prove the elements of its breach-of-contract claim by only a preponderance of the evidence, *i.e.*, that they were more probably true than not true. *Id.*; *Avery*, 216 Ill. 2d at 191.

¶ 69 On appeal from a bench trial, we assess whether the trial court's judgment was against the manifest weight of the evidence. *Chicago's Pizza v. Chicago's Pizza Franchise*, 384 Ill. App. 3d 849, 859 (2008). A judgment is against the manifest weight of the evidence when the opposite conclusion is clearly apparent or the judgment was unreasonable or not based on the evidence. *Best v. Best*, 223 Ill. 2d 342, 350 (2006). Under this standard, we give deference to the trial court and do not substitute our judgment for the court's credibility findings or weight to be given to the evidence. *Id.* at 351. Nevertheless, while we generally defer to the court's resolution of conflicts in the evidence and credibility determinations, " 'the manifest weight standard is not a rubber stamp. It does not require mindless acceptance in the reviewing court.' " *People v. Harris*, 2021 IL App (1st) 182172, ¶ 56 (quoting *People v. Anderson*, 303 Ill. App. 3d 1050, 1057 (1999); see also *Mahan v. Marion Police Pension Board*, 2023 IL App (5th) 210426, ¶ 29 (manifest weight review is a "considerably deferential standard," but appellate court review "cannot amount to a rubber stamp" of the proceedings merely because the trial court heard witnesses, reviewed evidence, and made findings). Rather, this court has a *responsibility* to examine the court's findings and determine whether they were unreasonable or not based on the evidence. *Id*.

¶ 70                                                     ii. Fraud

¶ 71    We start by acknowledging that, as noted above, we must defer to a trial court's credibility findings after a bench trial.  Here, the court did not find credible Blackhawk's evidence of an agreement between Stanton and EAT to keep the restaurant open in exchange for Stanton holding and never cashing the rent checks.  Specifically, it did not credit Niedholdt's testimony that he overheard a conversation of an agreement, and, instead, it found credible testimony from Stanton and Draus (and it referenced Robert's deposition testimony) that no such agreement or conversation took place.  Further, the court found credible Stanton's testimony that he did not know that Urban Grille was going to permanently close.  It also found credible Stanton's and Draus's testimonies that they would have had no reason to believe that Urban Grille was closing, given the marketing work they were performing for it.  In addition, Stanton testified that, when he asked Finley about the closed sign in EAT's window, Finley told him that EAT's chamber-of-commerce dues and liquor license were valid for the upcoming year.  Given the record evidence and testimony, the court's findings and decision to reject Blackhawk's theories of an agreement between Stanton and EAT or that Stanton knew EAT would be closing permanently were not unreasonable.

¶ 72    However, the court apparently believed that the fraud/fraudulent concealment (and breach-of-contract) claims emanated from and *depended* upon a conspiracy between Stanton and EAT, such that, once it found Niedholdt not credible, the claims fell like a house of cards.  The court seemingly reasoned that, since Niedholdt was not credible, Blackhawk's entire case was defeated and consideration of the other factual and legal issues was rendered "moot."  Therefore, it did not expressly address or consider the *remaining* evidence that Blackhawk had presented to establish its claims against Stanton.  For the following reasons, the court's decision that, because it did not believe Niedholdt, the remaining evidence independently or collectively could not support

Blackhawk's claims, particularly where it made no findings about that evidence, was unreasonable. Put differently, the judgment was against the manifest weight of the evidence, where the court did not consider all the evidence.

¶ 73    To establish fraud, a plaintiff must prove, by clear and convincing evidence, that (1) a defendant made a false statement or omission of a material fact; (2) the defendant had knowledge of or belief in its falsity; (3) the defendant intended to induce the plaintiff to act; (4) action by the plaintiff in reliance on the truth of the statements; and (5) damage to the plaintiff resulting from the reliance. *Lindy Lu LLC v. Illinois Central Railroad Co*., 2013 IL App (3d) 120337, ¶ 26. The first element encompasses three requirements: a defendant must make a misrepresentation, the misrepresentation must involve a fact, and the misrepresentation must be material. *Napcor Corp. v. JP Morgan Chase Bank, NA*, 406 Ill. App. 3d 146, 154 (2010).

¶ 74    Here, even *deferring* to the court's witness-credibility findings, the evidence reasonably reflected that Blackhawk satisfied its burden. Specifically, paragraph 5(a) of the contract required, as a condition precedent to closing for Blackhawk's benefit, that all of Stanton's representations and warranties under the agreement would "remain true and correct *in all respects* as of the closing date." (Emphasis added.) Moreover, Blackhawk asserts, and Stanton does not dispute, that paragraph 5(c) of the contract obligated Stanton to notify Blackhawk of any material adverse change, including a monetary default, which Stanton agreed would include non-payment of rent. Further, pursuant to paragraph 9(c) in the representations and warranties section of the contract, Stanton represented at closing that, "[t]o [his] knowledge, there is no default on the part of the tenants under the Leases."

¶ 75    The evidence relating to these sections reasonably reflects that Stanton made a material misrepresentation under the contract. The evidence demonstrated that Stanton did not, and could

not, deposit checks from EAT for the three months preceding the closing because he knew that, if deposited, the checks would not clear. In other words, he knew that EAT did not timely satisfy its obligations under the lease. Although Stanton vaguely speculated that he might have held the checks on the advice of his accountant, he presented no evidence to support that speculation and, in any event, testified both at trial and his deposition that, with respect to EAT's October, November, and December 2013 checks, he regularly called the bank to see if the checks would clear and, ultimately, was *never* able to deposit any of them.

¶ 76    Stanton asserts, Blackhawk acknowledges, and the trial court found, that, *technically*, there was no "default" as described in section 9(c) of the contract, because, as that term was defined under EAT's lease, a default occurred only if EAT failed to pay rent when due and the failure continued for 10 days *after* Stanton gave EAT written notice thereof. In other words, EAT was not in default because Stanton *chose* not to issue a written notice of default. Preliminarily, this technicality or justification is illogical, at least in the fraud context here; by extension, this would mean that EAT did not have to give Stanton *any* checks and, so long as he did not issue a written *notice* of default, Stanton's representation that there was no default would have been "truthful." But fraud claims encompass material omissions and misrepresentations. *Lindy Lu LLC*, 2013 IL App (3d) 120337, ¶ 26; *Napcor Corp.*, 406 Ill. App. 3d at 154. Warranting that EAT was not in default constituted a material misrepresentation, where the only reason EAT was not in "default" for more than three months of past due rent was because Stanton chose not to issue the written notice.

¶ 77    Stanton explained that he did not *view* EAT as being in default because he believed that the checks would eventually clear. He testified that EAT had always paid full rent over the seven years of the lease, even if sometimes it was late or the rent came in multiple payments. Stanton

asserts on appeal that, based on his good faith belief *at the* time that EAT was "current" on its rent and that he would someday be paid all amounts due to *him* through closing, Blackhawk could not establish that he made false statements or knew that his statements were false.

¶ 78    However, Stanton confuses his beliefs with his actual representations.  Namely, Stanton honestly thinking that *he* might someday be made whole does not change the nature of his obligations under the contract or his representations to *Blackhawk* at the time of closing.  In our view, both of Stanton's expressed considerations (he did not issue a default notice because he thought the checks would someday clear and EAT had always caught up and paid in the past), even if true, are irrelevant, as neither renders the representations and warranties Stanton made to *Blackhawk* any less materially false or misleading.  Stanton represented that, to his knowledge, on the date of closing, no tenant was in default under their leases when, actually, at the time of closing, EAT had *not* made good on those checks and more than $51,000 in rent had *not* been paid.  EAT gave Stanton checks, but they were bad checks when written and, accordingly, did not pay the rent. Even Stanton testified that he did not consider the rent paid if the checks were not good.[4]  Further, while the evidence demonstrated that EAT had, in the past, occasionally made partial rent payments or late rent payments, there was no evidence that it had ever produced any bad checks for the full amount of rent, let alone *three* in a row and no payment at *all* for a fourth month. Nevertheless, and deferring to the court's general finding that Stanton was credible, we accept that Stanton truly believed those checks to *him* would eventually clear.  However, his representations

_____

[4]Indeed, the checks were no better than IOU's and, thus, actual payment was not received when due, which, of course, is the common understanding of a default.  See, *e.g.*, Black's Law Dictionary, Default (12th ed. 2024) (defining "default," in part, as "The omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due").

and warranties to Blackhawk that there was no monetary default (which he agreed would include non-payment of rent), no default by any tenant under the lease, and that all of his representations were true and correct "in all respects" at the time of closing reasonably remained, if not outright false, certainly untrue and/or misleading.

¶ 79    We need not rely solely on the three held rent checks. The most critical piece of evidence, or the proverbial "smoking gun," was the prorated January 2014 rent reflected in the closing statement. We cannot defer to the court's findings regarding this evidence because the court did not make any express findings about it. In fact, *Stanton* did not even try to explain that payment in his posttrial submission to the trial court, nor does he explain it on appeal. Indeed, there is not much to be said: the evidence reflected that Stanton knew EAT did not pay January 2014 rent, but in direct violation of paragraph 7(a) of the contract, he prorated EAT's January rent at closing. Again, that paragraph of the contract provided that the parties would prorate all rents under the leases *collected* prior to the closing, but "shall not prorate any Rents which are past due as of Closing." As such, Stanton's affirmative payment was a false representation, *i.e.*, one reflecting that EAT paid January rent. Therefore, the evidence reasonably demonstrated that, as of the closing, Stanton knew that he was misrepresenting to Blackhawk that EAT was current on its rent.

¶ 80    Further, Stanton's payment at closing, which can also be reasonably characterized as non-disclosure of EAT's failure to present even a bad check for January 2014 rent, is not only *additional* evidence of a false statement and/or material misrepresentation or omission for fraud, but also evidence constituting fraudulent concealment. Indeed, to state a claim for fraudulent concealment, a plaintiff must allege:

> "(1) the defendant concealed a material fact under circumstances that created a duty
> to speak; (2) the defendant intended to induce a false belief; (3) the plaintiff could not have

discovered the truth through reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and justifiably relied upon the defendant's silence as a representation that the fact did not exist; (4) the concealed information was such that the plaintiff would have acted differently had he or she been aware of it; and (5) the plaintiff's reliance resulted in damages." *Bauer v. Giannis*, 359 Ill. App. 3d 897, 902-03 (2005).

¶ 81 Without question, the misrepresentation was material; even Stanton admitted that the rent EAT was required to pay under the lease was a "material" factor in the fair market value of the property at the time of closing. And there is no question that Stanton knew at closing that EAT had not paid rent in the months immediately preceding the closing, specifically, October, November, and December 2013, as well as January 2014. When asked directly, "You knew prior to the closing that EAT had not made good on three checks and paid nothing in January, correct?" Stanton answered, "yes." However, by making a representation that EAT was not in default, omitting that, because they would not clear, he had not deposited EAT's checks since October 2013, and offsetting at closing a prorated amount of January 2014 rent, making it *appear* as though EAT had paid rent in January, when it had not, Stanton induced a false belief, upon which Blackhawk relied and acted in accordance with by proceeding to close on the sale. The Wagenaars both testified that, if they knew EAT had not paid rent since October 2013, they would have stopped the sale.

¶ 82 We note that the intent element of fraud is often established through circumstantial evidence and inferences from that evidence. See, *e.g.*, *Browning v. Heritage Insurance Co.*, 33 Ill. App. 3d 943, 948 (1975) ("Fraud must be shown by allegations of facts from which fraud is the necessary or *probable* inference.") (emphasis added); *Broberg v. Mann*, 66 Ill. App. 2d 134,

140 (1965) ("The presence or absence of the requisite knowledge and intent to establish fraud may be determined from the evidence and the circumstances surrounding the transaction"). In that vein, it is reasonable to infer from the evidence, collectively, that Stanton intended that Blackhawk proceed to closing in reliance on his disclosures, representations, and warranties. Preliminarily, that Blackhawk would perform in *exchange* for and in reliance upon the relevant representations and warranties was literally part of the contract. Additionally, although Stanton testified that he was not concerned that Blackhawk would walk away from the sale (because he had other buyers waiting in the wings), thereby implying that he did not necessarily intend for Blackhawk to rely on any omissions or representations, he did not *act* consistently with that purported position. Even if true that he had other buyers lined up, he did not inform Blackhawk that, although EAT had handed him three checks, it had not actually paid rent that could be deposited since October 2013, but that he was confident the checks would eventually clear and then simply "let the chips fall where they may." He did not disclose the information and then allow Blackhawk to decide the relevance (*i.e.*, whether it wanted to proceed, delay the sale, negotiate another price, or walk away, leaving Stanton to pursue the other purported buyers waiting in the wings). Further, particularly given that he testified that he was a sophisticated business owner, with a lot of experience, it is surprising that, with three months' worth of bad rent checks, Stanton *never* communicated with EAT about those checks to ask whether they would ultimately clear, even if just to confirm the validity of his confidence that the payments would be made good. Stanton's position that the rent had always been paid in the past, even if late, ignores that the unpaid rent did not merely affect him, as he had a contractual obligation to Blackhawk to make accurate representations regarding that rent. As such, it is reasonable to infer that he did not ask because he did not want the responsibility of disclosing to Blackhawk a concerning answer and he wanted the sale to close.

Instead, he made material misrepresentations upon which Blackhawk relied and, it is reasonable to infer from the evidence, upon which Stanton *intended* for Blackhawk to rely.

¶ 83    Finally, Stanton implies that Blackhawk could have discovered the truth through reasonable inquiry or inspection.  In his posttrial submission, he suggested that maybe he *should* have disclosed the checks, but he was not *required* to and, therefore, perhaps Blackhawk should have requested bank statements.  Again, regarding whether he was specifically required to disclose the held checks, paragraph 9(c) obligated Stanton to represent and warranty that there was no default on the part of the tenants under the leases; not disclosing the fact that he was *holding* three checks that would not clear and there was no payment attempt for January 2014 was a material misrepresentation.  Further, paragraph 5(a) required, as a condition precedent to closing for Blackhawk's benefit, that all of Stanton's representations and warranties under the agreement "shall remain true and correct *in all respects* as of the closing date."  Moreover, Blackhawk points out that the checks also constituted a material adverse change that Stanton did not disclose, as contemplated by paragraph 5(c) of the contract, and Stanton agreed non-payment of rent would constitute a monetary default, which was a material adverse change.  Thus, we disagree that he was not required to disclose the existence of the three checks he had not deposited because he *could not* deposit them.

¶ 84    As to whether Blackhawk should have requested bank statements, we also disagree.  Stanton testified that Blackhawk was a thorough buyer and requested as much due diligence as anyone with whom he had ever worked.  Where even Cuscaden, Stanton's attorney for the sale, assumed, *based on the rent proration*, that January rent had been paid, it is not reasonable to suggest that Blackhawk could not rely on that prorated rent as representing EAT was current.  Further, in our opinion, this also elevates the significance of the estoppel certificate and income-

- 38 -

by-tenant summaries. We note that, like the January prorated rent payment, the trial court did *not* mention or make findings about either of these documents. In any event, even if we accept as credible that the estoppel certificate did not constitute a representation from Stanton, who did not prepare or sign it, and we further accept that Blackhawk's request for "historical rent collections" was not a term of art, was unclear, and therefore, that the income-by-tenant summaries were neither required by the agreement or *intentionally* misleading, they reasonably and collectively represented that EAT was current with respect to its full rent. Together, they certainly perpetuated the perception that EAT was fully paid. As such, given the backdrop of those two documents, along with Stanton's representations that EAT was not in default and had paid January rent, it is reasonable to conclude that Blackhawk justifiably relied on the information provided and was not unreasonable for not pursuing further inquiry or inspection.

¶ 85 In sum, Blackhawk carried a high burden to establish fraud. However, even giving deference to the court's credibility findings, the evidence reasonably reflected that Blackhawk proved its fraud and fraudulent concealment claims. Again, Niedholdt's testimony was unnecessary and, once discredited, the court failed to address the remaining evidence, most critically the prorated January rent at closing and the impact that payment and representation had on Blackhawk's claims. Although the court mentioned that it also found no fraud "for the additional reasons cited in Stanton's posttrial submission," it did not specify which reasons and, in any event, Stanton did not explain the January prorated rent there either. Further, we note that the trial court found that "Stanton *most probably should have* disclosed the information that he was holding these checks," (emphasis added) which begs the question *why* the court believed that to be the case, if not for the evidence reflecting that the omission was, at a minimum, materially misleading. Indeed, the court found the Wagenaars credible, and they testified that they relied on

the representations under the contract, the prorated January rent, as well as their understanding of the accuracy of the estoppel certificate and income summary, which provided context to their belief that, when Stanton prorated the January rent, representing EAT had paid in January, the primary tenant was fully operating and paying rent and the purchase price of the building remained accurate. They testified that, had they known that any of the aforementioned was false or inaccurate, they would have stopped the sale. Accordingly, we reverse the court's judgment on count III, addressing damages later in this decision.

¶ 86                                iii. Breach of Contract

¶ 87    Next, we address count IV, Blackhawk's breach-of-contract claim. To recover for breach of a contract, a plaintiff must establish: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff. *Van Der Molen v. Washington Mutual Finance, Inc.*, 359 Ill. App. 3d 813, 823 (2005). We review *de novo* a court's contract interpretation. See, *e.g.*, *Asset Recovery Contracting, LLC v. Walsh Construction Co. of Illinois*, 2012 IL App (1st) 101226, ¶ 57.

¶ 88    First, we address Stanton's position, as adopted by the trial court, that the contract claims should be dismissed based on the affirmative defense that they were untimely under paragraph 9 of the agreement. Although the parties do not focus on paragraph 10 of the agreement, we note that paragraph 10 allowed Blackhawk to pursue, post-closing, any action as a result of any untruth or inaccuracy of Stanton's representations and warranties, if the untruth or inaccuracy was material and Blackhawk did not have reason to learn or discover that they were untrue or incorrect before closing. There is no time limit set forth in this paragraph, and we noted in our previous decision that Stanton did not establish how Blackhawk could have learned or discovered the falsity of the representations before closing. *Blackhawk*, 2022 IL App (2d) 210452-U, ¶ 98. Thus, it appears

that the contract anticipated that, in situations such as this, Blackhawk could pursue its claims irrespective of the 12-month limitation in paragraph 9.

¶ 89     In any event, even setting aside paragraph 10 of the contract, given our determination that Blackhawk established fraudulent concealment of the claims, we must disagree with the trial court and Stanton that section 13-305 of the Code did not serve to render Blackhawk's claims timely. As explained above, the evidence reasonably showed that, by paying the January prorated rent at closing, particularly in conjunction with the three held rent checks (and given the backdrop of the income-by-tenant summary and estoppel certificate), Stanton intentionally concealed that EAT had not paid its rent through the closing, thereby preventing Blackhawk from discovering the existence of its claims. It was clearly established that Blackhawk did not learn of these facts until 2016, and filed its complaint in 2018, less than three years later and within the five years required by section 13-305 of the Code. Therefore, in light of the fraudulent concealment of the claims' existence, the court incorrectly dismissed the contract claims on the basis that they were untimely.

¶ 90     As such, we conclude substantively that Blackhawk proved its breach-of-contract claim. With respect to a breach by Stanton of his obligations under the contract, our analysis of the fraud claim applies here. Again, it is undisputed that the parties entered into a valid and enforceable contract, and Blackhawk performed under the contract. However, Stanton's payment of January prorated rent for EAT, when that rent was past due, breached paragraph 7(a) of the contract, and that payment along with the representation that EAT was current in rent and not in default, breached paragraphs 5(a), 5(c), and 9(c) of the agreement. Accordingly, we reverse the court's judgment on count IV.

¶ 91                                        iv. Damages

¶ 92    The fraud and breach-of-contract claims both required Blackhawk to establish damages. The court found that Blackhawk had established neither claim and that "there is no reason to consider the issue of damages." It then noted, however, that it found Orin's valuation testimony, *i.e.*, regarding the value of the property with and without EAT, speculative and unbelievable. It found Orin a "well-qualified expert," but it did not find sensical his opinion that the building lost "nearly half" of its value when it lost a tenant leasing only 34% of the space, particularly where that tenant might have left post-sale at any time for a multitude of reasons. The court found, "it makes no sense that having the tenant in place the day before nearly *doubles* the value of the property." (Emphasis added.) As such, the court found Munizzo "far more credible" in his opinion that the valuation was greater than the actual sales price. For the following reasons, we remand for damages calculations.

¶ 93    In its amended complaint, Blackhawk pleaded *alternative* damages theories, including damages (1) in the amount of $422,212 for lost rents while the Urban Grille unit was vacant; (2) in the amount of $302,179 for lost rents when the unit was rented at an amount less than the rent EAT had been required to pay in its lease; or, alternatively (3) in the amount equal to the difference between the fair market value that Blackhawk paid for the property as represented by Stanton and the actual fair market value of the property at the time of closing "without the rents EAT was falsely claimed to be making." Further, Blackhawk sought punitive damages for fraud, as well as attorney fees.

¶ 94    Later, in its posttrial brief to the court, Blackhawk argued that it was damaged by Stanton's fraud to the extent of the difference between the value of the property on the date of closing as represented by Stanton with EAT paying rent and the value of the property on that date without EAT as a paying tenant, in the amount of $1,490,000.00 (purchase price of $3,975,000 minus the

value Orin assessed of $2,485,000).  In addition, Blackhawk argued that its damages included lost rent, the expense of marketing the property, and the need to hire attorneys to intervene in the Di Pasquantonios' bankruptcy proceeding to discover Stanton's fraud.  Moreover, Blackhawk sought punitive damages, as well as attorney fees.  It noted that Susan testified and/or Blackhawk argued that: (1) the Urban Grille space was vacant for 15 months after the closing and that Blackhawk had to file a forcible action against EAT to regain legal possession of the property; (2) the total lost rent for the space vacated by Urban Grille, from the date of the closing to the time the space was re-let by Blackhawk, was $269,535 (10 x $17,850 + 5 x 18,207 = $269,535); and (3) she and David had to spend all of their savings, sell their primary residence, and cash in their life insurance policies to make the mortgage and other expense payments due to the loss of EAT's rent.

¶ 95    Here, the court expressly did not thoroughly consider the issue of damages, because it did not find fraud or a breach.  As such, it did not mention or consider *any* of Blackhawk's multiple theories for awarding damages, including lost rent, the personal expense to the Wagenaars, or punitive damages.  Further, the only theory the court addressed, which the parties agreed was an appropriate damages evaluation, was the difference between the purchase price and the value of the property without EAT as a tenant.  However, the court's findings in that regard rested on an incorrect premise.  Namely, the court did not find Orin lacked credibility as a witness, but it did find his valuation figure incredible because, it explained, Orin opined that the building lost almost half of its sale value with the loss of a tenant leasing only 34% of the space.  It did not believe that the building's value was almost "double" the day before the restaurant closed.  But that is not what Orin opined.  Indeed, Orin opined that the value without EAT was $2,485,000, reflecting a loss of $1,490,000.  By our calculations, $1,490,000 is approximately 37% of the $3,975,000 paid.

Accordingly, Orin essentially assessed that the loss of a tenant occupying 34% of the space reduced the value approximately 37%. In other words, losing the restaurant, which had occupied around 1/3 of the space, resulted in a diminution of value of roughly 1/3. The court's finding, therefore, was factually incorrect and, possibly, influenced its overall assessment of damages.

¶ 96    In addition, as Blackhawk notes, even if the court did not accept the exact figure Orin presented, it was not precluded from arriving at a figure it *did* find correct. Indeed, although proof of damages is an essential element of the claims, "absolute certainty concerning the amount of damage is not necessary to justify a recovery where the *existence* of damage is established; the evidence need only tend to show a basis for the computation of damages with a fair degree of probability." (Emphasis added.) *In re Application of Busse*, 124 Ill. App. 3d 433, 438-39 (1984). Further, "a presumption of at least nominal damages follows from proof of a legal wrong" and "liability for nominal damages is sufficient to sustain a cause of action." *Id.* at 439. Also, in light of our decision here and the evidence reflecting that Blackhawk was prevented from pausing or stopping the sale or negotiating another price, suffered a loss of rent, and its owners incurred significant personal expense, the court would not have been precluded from considering *those* theories, nominal damages, and/or punitive damages, irrespective of Orin's valuation. The fact that, theoretically, EAT or any tenant could have left post-sale for a multitude of reasons is not relevant, nor does it mean that Blackhawk was not damaged by Stanton's fraud or breach.

¶ 97    In sum, we disagree that Blackhawk did not establish any damages; rather, the court expressly did not fully consider damages and, to the extent it did, made factual errors. Accordingly, we remand for proceedings to determine an appropriate measure of damages to Blackhawk for the fraud and breach-of-contract claims.

¶ 98                      C. Attorney Fees and Costs

¶ 99     The contract provided that attorney fees and costs would be awarded to the prevailing party. In accordance with that provision and its judgment, the court awarded Stanton attorney fees and costs. However, we have reversed the court's judgment, and, therefore, also vacate its order awarding Stanton attorney fees and costs. We remand for proceedings to determine attorney fees and costs for Blackhawk, the now-prevailing party.

¶ 100                                III. CONCLUSION

¶ 101    For the reasons stated, we reverse the judgment of the circuit court of Kane County, vacate the award of attorney fees and costs, and remand for further proceedings consistent with this order.

¶ 102    Reversed; cause remanded.